Filed 3/8/23  P. v. Weathersby CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH LEE WEATHERSBY,<br><br>    Defendant and Appellant. | A163331<br><br>(Solano County<br>Super. Ct. No. VCR232498) |

A jury convicted defendant Kenneth Lee Weathersby of numerous sex offenses and found true multiple-victim and kidnapping allegations under the "One Strike" law.  The trial court sentenced defendant to consecutive indeterminate and determinate terms.

On appeal, defendant argues:  (1) the trial court abused its discretion in denying his requests for a continuance and for a mistrial; (2) the court erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (3) the prosecutor committed misconduct; (4) the court wrongly excluded evidence; (5) the court erred in denying his post-trial motion to compel discovery; and (6) the matter should be remanded for resentencing due to Senate Bill No. 567 and Assembly Bill No. 518.  We agree that a remand for resentencing is required due to amendments made by Senate Bill No. 567, but reject the remainder of

1

defendant's arguments.  We also conclude that corrections to the abstract of judgment must be made.

F<span style="font-variant:small-caps">ACTUAL AND</span> P<span style="font-variant:small-caps">ROCEDURAL</span> B<span style="font-variant:small-caps">ACKGROUND</span>

A jury convicted defendant of the following offenses: kidnapping to commit oral copulation and rape (Pen. Code, § 209, subd. (b)(1),[1] counts 1 and 7); forcible rape (§ 261, subd. (a)(2), counts 2 and 10); forcible oral copulation with a minor over the age of 14 (§ 288a, subd. (c)(2)(C), counts 3, 4, 5); criminal threats (§ 422, count 6); and forcible oral copulation (§ 288a, subd. (c)(2)(A), counts 8 and 9).  Counts 1 through 6 involved victim P.B., while counts 7 through 10 involved victim S.S.  The jury also found true the following allegations:  defendant personally used a firearm within the meaning of section 12022.5, subdivision (a)(1) as to count 6, and within the meaning of section 12022.53, subdivision (b) as to all the remaining offenses, and One Strike multiple-victim and kidnapping allegations (§ 667.61, subds. (d)(2), (e)(1) & (4)) as to the forcible rape and forcible oral copulation counts.  At a subsequent bench trial, the trial court found true that defendant had one prior strike conviction (§ 667, subds. (b)–(i)) and one prior serious felony conviction (§ 667, subd. (a)).

Pursuant to the One Strike law, the trial court sentenced defendant to consecutive terms of life without the possibility of parole on counts 2 through 5, and 50 to life for counts 8 through 10.  The court imposed a consecutive six-year determinate term on count 6.  The court imposed additional determinate terms for the various firearm enhancements, but stayed all of them except for 20 years imposed on counts 2 and 8.  The court imposed sentences for counts

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1 and 7, but stayed them pursuant to section 654, and also stayed imposition of the prior conviction enhancement under section 667, subdivision (a)(1).

The following briefly summarizes some of the trial evidence.

## A. The Prosecution's Case

The evidence against defendant included the following. S.S. was 19 years old and P.B. was 17 years old when they were separately attacked by defendant. Both victims testified about the crimes and identified defendant in lineups and in court. Defendant's DNA was found on a condom in the alley where he sexually assaulted S.S. and on the swab of S.S.'s clitoral hood. P.B. took police to defendant's home, where his car—the same one used during the crimes against her—was parked in the driveway and found to contain P.B.'s fingerprints. There was a video of P.B. escaping from defendant's car. The victims accurately described items belonging to defendant and his appearance, and P.B. accurately described the appearance of tattoos and moles on defendant's body and bumps on his penis.

## B. The Defense Case

The defense presented little evidence of its own and focused instead on questioning witnesses about the police investigation and certain discrepancies between the prosecution DNA analyst's original and "clarifying" reports.[2] In particular, the defense questioned Detective Mathew Mustard at length about the discrepancy in the DNA reports and suggested he interfered with the analyst's reporting of this information. The defense

---

[2] Among other things, the defense questioned DNA analyst Kevin Gazlay about reports that he wrote regarding a foreign minor contributor found on P.B.'s lip swab, and why he did not state in his 2018 report, but only in a clarifying report in 2020, that he had excluded the lip swab minor profile as being the same contributor of the male DNA on S.S.'s clitoral hood swab (which ultimately turned out to be defendant).

also questioned Mustard about prior criticism he received from the media for not believing a sexual assault victim in a different case.

DISCUSSION

## A.  Defendant's Requests for a Continuance and a Mistrial

Defendant contends the trial court abused its discretion in denying his midtrial requests for a continuance and for a mistrial.  The following are the facts underlying this claim.

### 1.  Additional Facts

The following events all occurred in 2020.  Jury selection in this case occurred in late February, and the evidentiary portion of the trial began on March 4.  On March 11, the trial court indicated there was not much evidence left, but because of witness availability issues, the court would recess until March 19.  The court anticipated it would instruct the jury and hear closing arguments the morning of March 20.

On March 18, expressing concern that proceeding with the trial would be unsafe due to the unfolding COVID-19 pandemic, defense counsel asked the court to recess the trial until a time when they could be "in a more stable position," or to declare a mistrial given that a recess "might have no known duration."  The prosecutor asked the court to discuss the situation with the jurors, and to proceed with trial if possible.  On the record, the court called each juror and discussed the prospect of proceeding with trial and the precautions being taken at the court in relation to the pandemic.  Two jurors (one an alternate) expressed they were willing though uncomfortable coming to court because of familial health concerns, but the remainder expressed they were willing and comfortable with proceeding.  Though it viewed both parties' requests as reasonable, the court tentatively ruled the trial would proceed and it would excuse the two jurors who expressed health concerns.

4

The next day, March 19, the court and parties discussed the fact that the prior evening, the Solano County Public Health Officer issued a countywide shelter at home order that excluded essential court services. The court denied defense counsel's renewed request for a continuance, noting the People wished to proceed, and it excused the two jurors who expressed health concerns. Defense counsel asked the court to tell the jury that defendant was not requesting a speedy trial; the court denied that request without prejudice.

On March 20, defense counsel again requested postponement of the trial, and the court again denied it. The court indicated its decision was based on its weighing various considerations, such as the fact that they were on the last day of trial; the two young victims had come to testify about the crimes; despite the shelter in place order, various businesses and organizations were exempt; and the jurors were screened and wished to be there, as did family members and the public. As the court predicted, the evidentiary portion of the trial concluded that day, and the court instructed the jury[3] and heard closing argument from the prosecutor. Due to insufficient time, the defense could not present closing argument, and the court recessed for the weekend and until March 24.

On Monday, March 23, however, the Presiding Judge of the Solano County Superior Court ordered the trial suspended until April 24. That same day, the Chief Justice of California, in her capacity as Chairperson of the Judicial Council, issued an order generally suspending jury trials statewide for 60 days. On April 21, after the defense filed another motion to continue, the parties stipulated to postponing further proceedings until May 20.

---

[3] The court declined defense counsel's request to instruct the jury that defendant was not asserting his speedy trial rights.

On May 18, defense counsel moved to continue the proceedings to June 22, noting that on April 29, the Chief Justice issued an order permitting an extension of the 60-day jury trial suspension for an additional 30 days.[4] On May 20, the trial court denied the request for a continuance. The court noted it reached out to all the jurors on May 18 and discussed the precautions being taken, and all the jurors indicated they were ready and available to proceed. All but one of the jurors appeared on May 20, and the court replaced the missing juror with an alternate. The court told the jury that trial was proceeding because the work of the courts needed to go on. The court asked the jurors if anything about the pandemic or the last 60 days would affect their ability to be fair to the parties, and none indicated anything would. All jurors also indicated they, and those close to them, had not tested positive for COVID. Moreover, none of them felt they could not pay attention, none wanted any extra safety measures, none were contacted to discuss the case, none read about the case in the media, and none would hold their required presence at the trial against either the prosecution or defendant.

Defense counsel then gave his closing argument, spending a lengthy portion of it arguing that Detective Mustard had caused the late disclosure of the fact that defendant's DNA was excluded from P.B.'s lip swab minor profile. The prosecutor gave her rebuttal, and after the jury retired to deliberate, defense counsel moved for a mistrial based on "cumulative error." Defense counsel claimed, among other things, that the court would not allow him to question the jurors or give them a questionnaire when the trial

---

[4]     The Chief Justice's order also stated: "Courts are strongly encouraged to collaborate with local justice partners to conduct a trial at an earlier date, if a court may do so in compliance with applicable health and safety laws, regulations, and orders, including through the use of remote technology, when appropriate."

resumed, and the jurors appeared frightened and tense while listening to argument and could not have normal deliberations. The court denied the requested mistrial, noting the jurors were appropriately screened and did not appear frightened. The jury returned its verdict the next day.

### 2. Legal Principles and Standard of Review

" 'A continuance in a criminal trial may only be granted for good cause. [Citation.] "The trial court's denial of a motion for continuance is reviewed for abuse of discretion." ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1181.) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames* (2007) 40 Cal.4th 907, 920.) Though "the denial of a continuance may be so arbitrary as to deny due process," there are no " 'mechanical tests' " for making that determination. (*Id.* at p. 921.) "Instead, '[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*Ibid.*)

As to the mistrial motion, "[a] trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).) The moving party bears the burden of demonstrating an abuse of discretion. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

### 3. *Analysis*

#### (a) *The requested continuances*

Defendant argues the trial court abused its discretion in denying the requested continuances. We disagree. The record establishes the court weighed numerous considerations in denying the motions, such as the People's desire to proceed, the jurors' wishes, the fact that the young victims had come in to testify, the health risks and precautions that could be taken, the circumstance that trial was nearly complete, and the uncertainty in the future as to where additional continuances might leave them. On this record, the court did not act unreasonably or arbitrarily in proceeding with the trial.

Defendant contends the court ignored the health concerns posed by COVID-19 and imperiled the health of the trial participants when it denied the requested continuances in March 2020. To the contrary, the record reflects that the court was deeply concerned about the unfolding pandemic and was fastidious about protecting the jurors. Indeed, the trial judge personally called each juror to speak about the pandemic, communicate the precautions the court would take if trial were to proceed, and ask for each juror's input before making a decision whether to proceed. The court indicated it understood that individual jurors might have different circumstances warranting different decisions about continued service. When jurors expressed health concerns, either on behalf of themselves or their family members, the court did not pressure them and indicated it would not order anyone to come in. And when the jury actually appeared in court on March 20, the court again asked the jurors if they had any concerns with moving forward, and none raised any.

The record also establishes that appropriate precautions were taken. As discussed, the court telephoned the jurors to discuss the circumstances

rather than making them appear. Additionally, much of the courthouse was shut down, so the proceedings were moved to a larger courtroom where participants could socially distance and an empty courtroom was cleaned for deliberations. Regular cleaning was occurring, and people entering the courtroom were asked to sanitize their hands and maintain social distance. The court also excused the jurors who expressed health concerns.

Next, defendant claims the denial of the requested continuances "posed a serious risk of prejudice to [defendant] from the jurors' understandable assumption that trial was proceeding forward due to [defendant]'s exercise of his speedy trial rights." Defendant, however, fails to point to anything that might support this claim, and the record contains no indication the jurors were considering or speculating that defendant exercised his speedy trial right. The fact that some media outlets were discussing the pandemic's impact on the judiciary does not suggest the topic was considered by any of the jurors.

Only one juror, on the telephone with the court on March 18, made passing mention of the right to a speedy trial.[5] But it is speculative to conclude the juror believed defendant was personally exercising his speedy trial right. It is equally possible, for example, that the juror was referencing the victims' right to a speedy trial (Cal. Const., art. I, § 28, subd. (b)(9)) or simply the general need for the judiciary to expeditiously conduct criminal

---

[5] When talking to the judge over the phone, the juror stated: "[W]hat you're telling me is pretty much what I predicted. People are saying, 'Are you still going? Is court still going?' And I said, 'Well, probably they will just have us spread out a little bit more.' [¶] But I think with the speedy trial, you know, rights and everything we are probably going to need to continue. But, . . . this all sounds . . . good. It sounds like you are doing everything that needs to be done to protect everyone. And I am in good health. So you can count on me to show up."

trials (§ 1050, subd. (a)).  In any event, this juror never indicated any bias for or against either side because of the situation and instead affirmed they could render a fair decision.

Defendant also argues the trial court erred in denying his requested continuances because (1) it was unlikely the trial could be concluded before a recess was required for public health reasons, and (2) adjourning in the midst of the prosecution's case would have posed less risk of prejudice to the defense than an interruption at a later and more crucial point in the proceedings, such as here when trial was suspended after the prosecutor's closing argument.  We disagree.  There is no reason to believe the court here suspected the case would be unlikely to conclude without a recess.  First of all, it would have been difficult to foresee that the Chief Justice would take the unprecedented step of suspending all jury trials statewide.  Even the county's shelter in place order had an exception that designated court services as an "essential service," and that county order had numerous other exceptions, such as for gatherings where social distance could be maintained, and for numerous other businesses categorized as "essential services" (e.g., banks, groceries, farmer's markets, hardware stores, educational institutions, businesses that supply other essential businesses).

Furthermore, though the trial court denied the requested continuances in March, it was ultimately correct in its stated belief that the evidentiary portion of the trial was nearly done—the evidence was in by March 20. Indeed, as recounted, *ante*, the evidence at trial included the victims' repeated identifications of defendant as their attacker and a plethora of direct and circumstantial evidence linking defendant to the crimes.  Because the evidence was straightforward and overwhelming, the court could reasonably have believed trial would be complete in short order.

10

Defendant contends the trial court compounded its error in denying the March continuance requests by resuming trial in May rather than continuing the case another 30 days or granting a mistrial because the same concerns that existed in March were largely present. We disagree for the reasons already articulated: the record does not reflect that the court ignored the health concerns posed by COVID-19 or imperiled anyone's health, nor does it reflect that the jury entertained any bias against defendant due to the resumption of the proceedings.

Defendant cites to *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, which concluded a court did not abuse its discretion in continuing the last statutory day for trial by 90 days due to the pandemic. (*Stanley*, at pp. 166, 168.) Defendant points to a passage in *Stanley* where, after describing the impact of the pandemic, the court states: "Under these circumstances, the trial court unquestionably was justified in finding that the COVID-19 pandemic constitutes good cause to continue defendant's trial until July 13, 2020, with a statutory deadline of July 29. Given the grave risks to court personnel, jurors, attorneys, and defendant himself that would be created by proceeding in accordance with the normal timeline, *any other conclusion would have been unreasonable in the extreme.*" (*Id.* at p. 170, italics added.)

Contrary to defendant's apparent suggestion, *Stanley* did not purport to consider whether courts necessarily abuse their discretion by denying a requested continuance due to the pandemic. (Cf. *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332 [" 'It is axiomatic . . . that a decision does not stand for a proposition not considered by the court' "].) That the pandemic provided good cause to continue the beginning of a trial in *Stanley* does not compel the conclusion that the court here abused its discretion in denying the requested mid-trial continuances.

11

In sum, we reject defendant's claim that the court erred in denying his requested continuances.

### (b) The mistrial motion

Next, defendant contends the trial court erred in denying his mistrial motion due to the 60-day recess between March and May. He claims he was prejudiced by the fact that the recess took place right after the prosecution's closing argument, and "the sheer duration of the interruption" was "irremediably harmful due to the inevitable loss of recall of testimony that had been given many weeks earlier."[6] Again, we find no error. Defendant fails to identify anything in the record indicating that he was incurably prejudiced by the delay or that the court acted unreasonably or arbitrarily in denying the motion. Though he suggests he was prejudiced by the fact that the recess occurred right after the prosecution gave its closing argument, we note the defense gave its closing argument at the start of the resumed trial in May, which was much closer in time to the jury's deliberations. Thus, one could speculate that the timing of the recess worked to defendant's advantage, because the prosecutor's closing argument was more remote in time. (See *People v. Breceda* (2022) 76 Cal.App.5th 71, 95 (*Breceda*).)

Defendant's claim of prejudice resulting from "the sheer duration" of the recess and the inevitable loss of recall of testimony is not supported by the record. On this point, we note the presentation of evidence took place over the course of only six days. The defense offered very little evidence of its own, and the prosecution's evidence was uncomplicated even though it involved some DNA evidence. And as discussed, the evidence of guilt was

---

[6] Acknowledging the tension between this argument and his earlier argument concerning the motions for continuances, defendant clarifies in his reply brief that his arguments concerning error in denying his requested continuances and a mistrial are made in the alternative.

overwhelming. (See *ante*, at p. 3.) Moreover, the jury heard closing argument from the defense and rebuttal argument from the prosecutor, during which both sides discussed the evidence just before deliberations, which likely mitigated any effect of the delay on the jurors' recall. (*People v. Santamaria* (1991) 229 Cal.App.3d 269, 282 (*Santamaria*) ["counsels' recapitulation of the evidence during argument might have nullified or minimized the effect of the delay on the jurors' recall"].) Indeed, the jury requested a readback only of the testimony of one of the victims and asked to see one of defendant's Facebook entries again. This suggests the jury had no trouble recalling the evidence.

Defendant relies on *People v. Dinsmore* (1894) 102 Cal. 381, *Santamaria*, *supra*, 229 Cal.App.3d 269, and *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 in arguing the claimed error was prejudicial. He also cites *United States v. Hay* (9th Cir. 1997) 122 F.3d 1233 (*Hay*) in arguing the error violated his rights to due process and a jury trial. We have reviewed these cases and find them inapposite for similar reasons expressed by another court that dealt with an even lengthier delay due to the pandemic. (*Breceda*, *supra*, 76 Cal.App.5th at pp. 74–75, 95–97.) Unlike the cases relied on by defendant, in this case there unquestionably was good cause for the delay due to the pandemic. The trial judge was ordered by his presiding judge to suspend the trial, and the Chief Justice of California had ordered a statewide suspension of jury trials. Thus, the judge could not simply transfer the case to another judge, and the court had no choice but to comply. (*Id.* at pp. 96–97.)

Moreover, in contrast to the situations in defendant's cases, when the proceedings in this case resumed, the trial court confirmed that the jurors had not been contacted about the case; they had not read about the case in

13

the media or spoken to each other; none would hold their required attendance at trial against either party; and nothing impacted their ability to continue the trial and be fair to both parties. Unlike *Santamaria*, the trial here was not recessed in the midst of deliberations. And unlike *Hay*, this case did not involve "complex, technical evidence against two defendants [presented] over a period of nearly four months." (*Hay*, *supra*, 122 F.3d at p. 1236.)

In sum, we reject defendant's claim that the court erred in denying his requests for continuances or for a mistrial.

## B. *Batson/Wheeler*

Defendant argues the trial court erroneously denied his *Batson/Wheeler* motion concerning the dismissal of Prospective Juror number 28. We conclude the court did not err.

### 1. *Additional Facts*

Jury selection took place over two days. About 140 panelists reported for jury service and, after excusals for hardship, 114 remained. On the first day, Prospective Juror number 9 (No. 9), an African-American male, expressed that he would prefer to be elsewhere, that he had issues with the legal system, that he dislikes lawyers, and that as a father of four daughters he would have problems with sexual crimes involving minors. No. 9 also stated that if he were to give either attorney a "leg up," it would be the defense because he has a problem with institutions and "institutionalizing stuff," and his decision would be based on the attorneys' performance.

Prospective Juror number 8 (No. 8), another African-American male, reported he had been prosecuted for exploiting funds from his "mentally challenged" sibling, for whom he was the guardian, but ultimately the case was dismissed. He thought the prosecutor in his case was harsh and out to get him, but later he realized the prosecutor was just doing their job. No. 8

14

said he initially had a negative perception of public defenders but changed his opinion after he was represented by one who did good work.

Toward the end of the first day, the court invited the parties to exercise peremptory challenges. The prosecutor exercised three peremptory challenges without objection, including one against No. 9. Prospective Juror number 28 (No. 28)—an African-American female—was among the seven new panelists to replace those who had been excused from the jury box.

Upon entering the jury box, No. 28 indicated the food she ordered was at the courthouse and she asked to retrieve it outside, which the trial court permitted. The court began its examination of the new group of prospective jurors apparently in No. 28's absence. When finally questioned by the court, No. 28 indicated she had never served on a jury, she works at an armored car business where she "count[s] the money all day," and there was no reason she could not hear this case if chosen.

The following day, the prosecutor asked the jurors whether they would require DNA or fingerprint evidence to convict, even if the prosecution otherwise presented sufficient evidence to prove a charge beyond a reasonable doubt, and No. 28 indicated she might. She indicated that whether she would require such evidence depended on the evidence in the case and how it was presented, and said she could keep an open mind but could not commit one way or the other.

When the trial court called upon the attorneys to exercise their peremptory challenges, the prosecutor eventually exercised a peremptory challenge against No. 8, which the defense challenged under *Batson*. The defense argued there was no race-neutral reason for dismissing No. 8 and, given the dismissal of No. 9 the day before, there was a pattern of challenging

African-American jurors. The court ruled there was a prima facie case for the motion, which shifted the burden to the prosecution.

Observing that one of the victims was African American, the prosecutor said she was interested in having African-Americans on the jury. She argued that, given No. 9's statements, there was no pattern of race-based challenges. She then noted that No. 8 had expressed negative feelings against the system and the prosecutor in the embezzlement case involving his disabled brother. The prosecutor also noted her excusal of a white male prospective juror who had a history of being prosecuted and did not like the system, and explained she was not interested in having jurors on the panel who had been prosecuted and might hold it against her.

The trial court discussed the issue at length. The court indicated that No. 9 was legitimately excused based on his voir dire statements, and that a neutral, non-racial reason was arguably shown for No. 8's excusal. But, the court explained, it would seat No. 8 as a trial juror, because "defendants should have some people that look like them on their jury" and keeping No. 8 served that interest. Immediately after the court seated No. 8, the prosecutor exercised a peremptory challenge against No. 28, triggering the *Batson/Wheeler* motion presently at issue. This was the exchange that transpired:

"[The prosecutor]: The People would like to thank and excuse [No. 28]. Thank you.

[No. 28]: Yes.

[Defense counsel]: Judge, I have a motion.

[No. 28]: Oh, man.

16

THE COURT:  Oh, we are going to clear the courtroom again.  Sorry.
Actually, hold on.  Hold on.  Hold on.  Stay where you're seated.
Lawyers approach.

[No. 28]:  Should I sit down?  What should I do?

THE COURT:  You can stay right where you are.  Don't move.

[No. 28]:  All right.

(Discussion at the bench, not reported.)

[No. 28]:  I was almost out of here.

THE COURT:  Thank you, ma'am.  You are excused.

[No. 28]:  Yes, yes.

THE COURT:  A double 'yes.' "

Once jury selection was complete, the trial court addressed the defense's motion concerning No. 28 after clearing the courtroom.  The court began by stating, "[Defense counsel] is making a record as to the excusal of [No. 28].  He claims, again, African-American female, which she was.  So the burden I believe shifts to the People."

The prosecutor responded by first noting four African Americans were seated on the trial jury:  three males and one female.  As to No. 28 specifically, the prosecutor asserted that she seemed very "flip" in response to the whole process, i.e., she ordered food and felt it was more important to get food than sit and listen to what the court was saying, and she wore what appeared to be "fuzzy little slippers" to court.  Observing that No. 28 was young and appeared to lack life experience, the prosecutor stated, "I take into consideration whether our jurors have life experiences and are able to evaluate the evidence with those life experiences.  I didn't feel [No. 28] did."  Last, the prosecutor said, "I believe she said she might take into

17

consideration that I did not provide scientific evidence to support my case; it might affect her, and she might not be able to render a verdict."

The trial court denied the *Batson*/*Wheeler* motion as to the excusal of No. 28, indicating there was certainly a non-racial reason for excusing her. The court recalled No. 28's comment that her ability to render a verdict might be affected if the prosecution failed to provide scientific evidence. Moreover, noting that it did not recall ever having a prospective juror leave to get food during the voir dire process, the court commented that having food delivered to the court at 4:00 p.m. was "one of the more unusual circumstances that I have seen." The court further noted that it noticed No. 28's slippers which, along with the answers she gave, made it very concerned that such a person might make "important decisions and sit[] on a case like this." The court also noted that when No. 28 was excused, she loudly said "yes" more than once, and did not appear interested in participating in the process. Defense counsel did not offer any further comment in regard to his motion.

### 2. *Analysis*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759.) " ' "[T]he burden is on the opposing party to demonstrate impermissible discrimination." [Citation.] "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all

18

relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' " (*Id.* at p. 760.)

Here, the trial court failed to make a first step determination whether defendant made a prima facie showing that the prosecutor acted with discriminatory purpose.  Instead, when the defense made its motion, the court "thought there was a non-discriminatory basis for excusing her" and agreed to hear the motion later.  Later, in addressing the motion, the court started by indicating its belief that "the burden . . . shifts to the People."  Neither party objected or asked for a clear ruling as to whether defendant made a prima facie showing.

Where, as here, the trial court made no ruling on a prima facie showing but "required the prosecution to state its reasons for exercising peremptory challenges, we skip the first two steps and move straight to considering the credibility of the prosecution's stated reasons and whether the record as a whole reveals a discriminatory motive for removing even a single prospective juror." (*People v. Salinas* (2022) 77 Cal.App.5th 20, 33; *People v. Scott* (2015) 61 Cal.4th 363, 393.)  "This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)  This means that "[t]he prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient." (*People v. Hardy* (2018) 5 Cal.5th 56, 76.)

A trial court's determination that the prosecutor's justification in this third stage was genuine and credible is reviewed for substantial evidence, but a reviewing court conducts its review with " ' "great restraint" ' " and begins

19

from the presumption that "an advocate's use of peremptory challenges occurs in a constitutional manner." (*Gutierrez, supra,* 2 Cal.5th at p. 1159.) The court's conclusions "are entitled to deference . . . when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Ibid.*) "A court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling. [Citations.] Under our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility.' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1077–1078.) That assumption, however, can be rebutted. "When 'the proffered reasons lack[] inherent plausibility or [are] contradicted by the record,' the court's failure to probe, or to explain, may eliminate the basis for deference." (*Ibid.*)

Here, the prosecutor provided the following reasons for excusing No. 28: first, she was "flip" in her manner and attitude toward the jury selection process, as illustrated by her having food delivered to the court and going to retrieve it rather than listen to what the court had to say, and by wearing fuzzy slippers to court; second, she was young, and the prosecutor did not think she had the life experience to evaluate the evidence; and third, she said that she might be unable to render a verdict if the prosecution did not present scientific evidence. Defense counsel made no attempt to dispute the accuracy of the prosecutor's observations, nor the sincerity of her justifications.

We conclude these justifications are supported by the record and are not inherently implausible. First of all, the voir dire transcript plainly

20

reflects that No. 28 asserted her potential inability to convict absent DNA or fingerprint evidence, even if the prosecution proved defendant's guilt beyond a reasonable doubt through other evidence.[7]  When a juror's answers to voir dire questioning create a plausible concern that the juror might not follow the reasonable doubt standard, or might require something more from the prosecution to convict, a race-neutral ground for a preemptory challenge exists.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 84.)

Moreover, as recounted above, the reporter's transcripts confirm that, as soon as No. 28 was called into the jury box, she asked to leave the courtroom to pick up a food delivery rather than participate in the jury selection process.  No. 28 wore what appeared to both the court and the prosecutor to be fuzzy slippers, and when she was excused, she let out a celebratory "yes," followed by, "Oh, man," when the defense attorney stated he had a motion.  Then, when the court ultimately excused No. 28, she let out a celebratory "Yes, yes."  Together these circumstances reasonably support the trial court's conclusion that the prosecutor had valid race-neutral reasons for exercising the peremptory challenge.  (See *People v. Watson* (2008) 43 Cal.4th 652, 680 [excusing a potential juror who is "too immature [and] irresponsible" to serve is a legitimate race-neutral action]; *People v. Jones* (2017) 7 Cal.App.5th 787, 805 ["a prospective juror's youth and corresponding lack of life experience can be a valid race-neutral reason"]; *People v. Barber* (1988) 200 Cal.App.3d 378, 396 [non-biased reasons for excusing juror included fact that prospective juror was wearing a "Coors jacket," which

_____

[7]     Though No. 28 said at one point that whether she would require such scientific evidence to convict would depend on the evidence presented, she additionally stated she might need that type of scientific proof to convict even if there was already proof beyond a reasonable doubt.

might suggest "a lack of respect for the dignity of the court or the court system or, on the other hand, perhaps a general lifestyle or attitude"].)

Contrary to defendant's claim, the trial court here made a sincere and reasoned attempt to evaluate the prosecutor's justifications. The court inquired into the basis for No. 28's excusal and, after the prosecutor set out her justifications, the court recalled the juror's comment that her ability to render a verdict might be affected if the prosecution failed to provide scientific evidence. The court also discussed its own in-court observations of the prospective juror, which were in line with what the prosecution observed. And notably, before addressing this particular *Batson/Wheeler* motion, the court heard the defense's first *Batson/Wheeler* motion regarding No. 8. The court's lengthy discussion and resolution of that issue—i.e., ultimately seating No. 8 as a trial juror for the sake of "hav[ing] more people who look like this defendant on the panel"—clearly showed that the court was attentive to the issue at hand.[8] This record stands in contrast to what happened in *People v. Allen* (2004) 115 Cal.App.4th 542, where the prosecutor justified a challenge to a potential juror merely by stating, " 'her very response to your answers, and her demeanor, and not only dress but how she took her seat,' " and the trial court prejudicially erred in failing to conduct further inquiry into the proffered reasons. (*Id*. at pp. 546, 552–553.)

In sum, we conclude that substantial evidence supports the trial court's determination regarding the prosecutor's justifications for excusing No. 28. Contrary to defendant's assertions, the record does not establish that the prosecutor's justifications for excusal were pretextual or that the court failed

---

[8]     We express no opinion as to the propriety of the trial court's decision to seat No. 8 after indicating the prosecutor offered a valid race-neutral reason for exercising a peremptory challenge.

to make a sincere and reasoned effort to evaluate the prosecutor's justifications.

### C. Prosecutorial Misconduct During Closing Argument

The prosecutor began her closing argument by thanking the jury then stating: "(S.S.) was kidnapped, raped and forced to perform oral cop on July 16th, 2018. (P.B.) was kidnapped, raped, and forced to perform oral cop on July 30th, 2018. Like we said at the beginning of this case: Two separate girls. Two separate dates. One worse nightmare. And Kenneth Weathersby is their monster." Later, transitioning from discussing the evidence with respect to the incident involving S.S. to the incident involving P.B., the prosecutor stated: "What about (P.B.)? Let's now talk about what happened to (P.B.). Because about two weeks go by, and then her worst nightmare happens. Right? The monster strikes again." Finally, after showing the video of P.B. running from defendant's car, the prosecutor stated: "See her coming around towards the building. Look at her run, afraid for her life, trying to get away from her monster."

Defendant now argues the prosecutor committed misconduct by referring to him as a "monster" during closing argument, which he claims dehumanized him in front of the jury. He also contends that word has "racial overtones" which violated section 745, subdivisions (a)(1) and (a)(2), a statute recently added by the California Racial Justice Act (CRJA). The People respond that defendant forfeited the claim of misconduct by not objecting or requesting an admonition and that in any case he fails to show error or prejudice. We agree with the People.

" ' " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of

23

due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 175 (*Suarez*).) When a claim of misconduct is based on the prosecutor's remarks to the jury, the defendant must show a reasonable likelihood that the jury construed or applied the challenged remarks in an objectionable fashion. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) " 'To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm.' " (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

The Supreme Court has had at least two occasions to address claims where the defense did not object to prosecutorial argument referring to a defendant as a "monster." (*People v. Chatman* (2006) 38 Cal.4th 344, 407; *People v. Sully* (1991) 53 Cal.3d 1195, 1249–1250.) In both cases, the Supreme Court rejected the claims, reasoning that any harm caused by the remarks could have been cured by an objection and admonition. (*Ibid*.) We see no reason to conclude differently here. Had the defense in this case objected at the beginning of the prosecutor's closing argument, then the court could have admonished the prosecutor and likely prevented any further references, and the jury could have been instructed to disregard the comment.

*People v. Herring* (1993) 20 Cal.App.4th 1066 (*Herring*) does not compel a different result. During closing argument in that case, the prosecutor attacked defense counsel, stating things like: " 'I chose this side and he chose that side. My people are victims. His people are rapists, murderers, robbers,

24

child molesters.' " (*Herring*, at p. 1073.)  The prosecutor also leveled a series of ad hominem attacks at a biracial defendant who was charged with various sex crimes.  (*Id.* at pp. 1070–1071, 1074.)  Among other things, the prosecutor said: " '[the defendant] wants to have sex with her again.  I mean this is primal man in his most basic level.  He's [sic] idea of being loved is sex.  He wouldn't know what love was.  He's like a dog in heat. . . .'  'This is primal man.  He thinks all I have to do is put a little force on her. . . .'  'He's like a parasite.  He never works.  He stays at people's homes.  Drives people's cars.  He steals from his own parents to get anything. He won't work for it.' " (*Id.* at pp. 1073–1074.)  On that record it was determined that further admonition would not have cured the harm, in part because the "primal man" remarks were both in bad taste and were unwarranted by the evidence of the crimes, which did not reveal undue violence or infliction of injury.  (*Id.* at p. 1074.)

The remarks at issue in *Herring* do not compare to the prosecutor's brief and isolated uses of "monster" here.  More to the point, whereas the remarks in *Herring* were unwarranted, here, the prosecutor reasonably described defendant as the monster in the worst nightmares of the two young victims.  Considering the evidence of defendant's violent sex crimes against these teenaged victims, we cannot say that description was unwarranted.

In any case, were we to set aside the forfeiture, we would nonetheless conclude the misconduct claim lacks merit.  The California Supreme Court has routinely held that "[c]losing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180; see, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 168 [no misconduct where "the prosecutor referred to defendant as 'monstrous,' 'cold-blooded,' vicious, and a 'predator' "]; *People v. Harrison* (2005) 35 Cal.4th 208, 246 [referring to defendant as "evil" was

within the permissible scope of closing argument].)  Again, the description of defendant as the monster in the worst nightmares of these two young women was warranted by the evidence.  Moreover, these brief and isolated alleged epithets could not have been prejudicial under any standard in light of the record and the overwhelming evidence of guilt.  (*People v. Sanders* (1995) 11 Cal.4th 475, 527.)

Finally, we reject defendant's argument that the prosecutor's remarks violated section 745, subdivisions (a)(1) and (a)(2) of the CRJA.  While "monster" is a race-neutral term, we acknowledge its use could, under certain circumstances, be employed to invoke racist tropes.  (*People v. Thompson* (2022) 83 Cal.App.5th 69, 129 [conc. opn. by Lie, J.].)  In the context of this case, however, there is nothing in the closing arguments suggesting the prosecutor used the term in a way so as to implicate defendant's race.  (*Id.* at pp. 95–96 [maj. opn. by Bamattre-Manoukian, J.].)  Indeed, defendant provides not a single record citation to support the perceived CRJA violation.  That one of the victims was African American and multiple African-American jurors sat on the jury are additional circumstances that belie the claim.  Nevertheless, we join the call for courts and counsel to "be aware of explicit and implicit racial biases" and "to be vigilant in their efforts to ensure compliance with the Racial Justice Act and the provision of fair trials."  (*Id.* at p. 96.)

In sum, we reject the claim of prosecutorial misconduct.

**D.  Prosecutor's Failure to Prevent a Witness's Disclosure**

In a second prosecutorial misconduct claim, defendant argues that the prosecutor failed to prevent a witness from disclosing defendant had spent time in jail, and that the trial court abused its discretion in denying his mistrial motion based on that disclosure.  We are not persuaded.

### 1. *Additional Facts*

Prior to trial, the defense moved to exclude evidence of defendant's 2008 convictions for first degree residential burglary (§ 459) and possession of controlled substances for sale (Health & Saf. Code, §§ 11351.5 & 11378). Noting defendant's criminal history was sparse and remote, the court ruled that evidence of his prior convictions was inadmissible, but that the prosecutor could cross-examine defendant with his prior felony convictions if he testified.

During trial, the prosecution called defendant's significant other, K.T., to the stand. The prosecutor began her direct examination of K.T. by asking questions concerning her relationship with defendant, e.g., how she knew him, how many children they shared, and how long they had been together. K.T. indicated she and defendant were together for roughly 15 years. The prosecutor then asked, "During that period of time were you in a substantial relationship with him? Like did you guys live together for that whole 15 years?" K.T. responded, "As long as he wasn't in jail, yeah." The prosecutor immediately moved on to question K.T. about other topics, such as about his appearance around the time of the offenses in July 2018.

When the prosecutor completed her direct examination, defense counsel asked to approach the bench and objected to K.T.'s remark about defendant spending time in jail. Defense counsel acknowledged it did not appear, and he could not credibly argue, that the prosecutor intended to elicit that information, but he thought the prosecutor should have admonished K.T. not to discuss such things before testifying. In terms of remedy, defense counsel stated: "What I am asking for at this point is a mistrial, which the Court will deny. And . . . when the Court denies that, I would ask for the Court to instruct them that whatever his prior arrests were, the involvement that

27

caused him to be in jail did not consist of any sex offenses, which is the truth."

The prosecutor responded that she was surprised by the answer, had not meant to elicit that information, and tried to move on immediately. The trial court agreed the prosecutor had moved on immediately and K.T.'s response was "completely unsolicited." The court disagreed with the suggestion that the prosecutor should have admonished K.T. not to mention defendant's prior time in custody because defendant had very little of it to speak of, so the answer really "came out of left field." With the parties' agreement, the court admonished the jury: "[K.T.] had mentioned on direct a comment about her living conditions with [defendant]. [¶] First, ladies and gentlemen, none of that is relevant to the case. But, secondly, any time [defendant] spent incarcerated was brief and was for issues that were nonviolent, non-sexually related."

### 2. *Analysis*

Defendant argues the prosecutor failed to prevent K.T.'s disclosure of his time in custody, K.T.'s statement was incurably prejudicial, and the court abused its discretion in denying his mistrial motion.

A prosecutor who intentionally elicits inadmissible testimony is guilty of misconduct. (*Suarez, supra*, 10 Cal.5th at p. 175.) " 'A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 65.)

Here, the prosecutor's question was singular, and she immediately moved on to a different topic after K.T. gave the answer at issue. On this

record, defendant fails to show a " 'pattern of conduct so egregious that it rendered the trial fundamentally unfair' " in violation of the federal Constitution. (*Suarez, supra*, 10 Cal.5th at p. 175.) Moreover, no state law misconduct appears because the question was innocuous, and even defense counsel acknowledged he could not credibly argue the prosecutor intended to elicit that information. (*Ibid.*; see, e.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1405.) We find no merit to defendant's claim of misconduct.

As for defendant's mistrial claim, a trial court should grant a motion for mistrial only "if it is 'apprised of prejudice that it judges incurable by admonition or instruction.' " (*Avila, supra*, 38 Cal.4th at p. 573.) "A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) Though "exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial" (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580), "[i]mproper evidence of prior offenses results in reversal only where the appellate court's review of the trial record reveals a closely balanced state of the evidence." (*People v. Stinson* (1963) 214 Cal.App.2d 476, 482.) We review the denial of a mistrial for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 953.)

Here, K.T.'s remark indicated that defendant spent time in jail, but not what he had been in jail for, nor for what length of time. The prosecutor did not dwell on the remark and immediately turned to another topic. After the prosecutor's examination of K.T.—which was not particularly lengthy—the court admonished the jury that K.T.'s mention of defendant's incarceration was irrelevant to the case and that the period of incarceration was brief and for nonviolent and non-sexual matters. We presume this admonition cured

any perceived harm.  (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404.) Moreover, the record discloses overwhelming evidence of guilt, which the defense did little to offset.  No basis for reversal appears.

Defendant's authorities are unavailing, as they align with our conclusion that a mistrial is inappropriate where, as here, the case against the defendant is not a close one.  (E.g., *People v. Parsons* (1984) 156 Cal.App.3d 1165, 1171–1172; *People v. Bentley* (1955) 131 Cal.App.2d 687, 689–690.)

In sum, we reject the claim of misconduct.

## E.  Exclusion of Evidence

On direct examination of K.T., the prosecutor asked what transpired on July 31, 2018.  K.T. testified that after work, she went to the home of defendant's cousin because she knew defendant's car was there.  The prosecutor asked how K.T. knew that, and K.T. responded she knew because defendant had called her.  The prosecutor moved on to ask what occurred after she went to the home of defendant's cousin.

Cross-examination consisted of the following:  defense counsel asked whether, during the aforementioned conversation, defendant said that "somebody was lying on him."  K.T. responded, "He said he didn't rape nobody."  The prosecutor objected on hearsay grounds and moved to strike. The court sustained the objection and granted the motion to strike, declining defense counsel's request to approach the bench or go outside the presence of the jury.

The following day defense counsel argued that because the prosecutor elicited evidence that defendant had switched cars with his cousin—from which the jury could infer that defendant was fleeing and evading law enforcement—the prosecutor opened the door to defendant's rape denial

30

statement under Evidence Code section 356's rule of completeness. After hearing from the prosecutor, the court excluded the rape denial statement.

Defendant contends his rape denial statement was wrongly excluded because it was admissible under Evidence Code section 356 and the rule of completeness to counter what he perceives as the prosecution's attempt to characterize the exchange of vehicles with his cousin as evidence of flight and consciousness of guilt.

Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." This statutory provision is often referred to as "the rule of completeness." (*People v. Armstrong* (2019) 6 Cal.5th 735, 786 (*Armstrong*).)

As the *Armstrong* court explained, Evidence Code section 356 operates " 'to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] . . .' The rule reflects the ' " 'equitable notion' " ' that a party seeking introduction of one part of a statement cannot selectively object to introduction of other parts necessary to give context.' " (*Armstrong, supra*, 6 Cal.5th at pp. 786–787.) We review a ruling under Evidence Code section 356 for abuse of discretion. (*People v. Johnson* (2022) 12 Cal.5th 544, 605 (*Johnson*).)

Here, the trial court did not abuse its discretion in excluding defendant's statement. As the prosecutor explained to the court, she inquired why K.T. went to the home of defendant's cousin because the police reports

noted defendant had called K.T. from his cousin's phone, which K.T. thought was odd. The prosecutor did not elicit any statements made by defendant during that phone call. Moreover, because defendant's cousin had already testified to the fact that she and defendant had switched phones and cars, the prosecutor indicated she would rely on the cousin's testimony to make her argument about evasion. Finally, defendant's rape denial statement was not necessary to understand why K.T. went to the home of defendant's cousin; nor did the exclusion of defendant's statement create a misleading impression about why K.T. went to the home of defendant's cousin. (Evid. Code, § 356; *Armstrong, supra*, 6 Cal.5th at p. 787.) On this record, it was reasonable for the court to exclude defendant's rape denial statement.

We also reject defendant's claim that the trial court's exclusion of his statement violated his rights to due process, to present exculpatory evidence, and to confrontation. " ' "[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1243 (*Prince*); see, e.g., *Johnson, supra*, 12 Cal.5th at pp. 606–607 [where court acted within its discretion to exclude portions of statements under Evidence Code section 356, claim that court violated defendant's due process rights by excluding relevant evidence fails].) Here, application of ordinary evidentiary rules did not impermissibly infringe on defendant's right to present a defense, and the proffered evidence lacked significant probative value to implicate his due process rights. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999.) Indeed, defendant's statement was self-serving and perhaps even more incriminating than exculpating insofar as it indicated defendant's suspicion that law enforcement was pursuing him for a sexual offense.

We reject the claim that the court erred by excluding his statement.

## F. Post-Trial Discovery

Defendant contends the trial court abused its discretion in denying his post-trial motion to compel discovery because the items sought were material and exculpatory within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). We cannot agree.

### 1. Additional Facts

Several months after the jury verdict but before sentencing, allegations of misconduct in the Vallejo Police Department came to light. Specifically, a former police captain told the media there was a longstanding tradition among Vallejo P.D. officers to commemorate fatal shootings by bending the tips of their police badges. The former captain also reported police misconduct during the investigation of a kidnapping case involving Denise H. Detective Mathew Mustard, who testified at defendant's trial, had worked on and received criticism in the media for his work in the Denise H. case. Defense counsel also learned after defendant's trial that Detective Mustard was possibly being investigated for calling an African-American detective " 'boy.' "

Defendant filed a post-trial motion to compel discovery, arguing the reports of misconduct bore on the credibility of Detective Mustard and the other police officers who worked on his case, which had been a central issue at trial for the defense. Defendant sought information regarding the badge bending allegations, including the concealment and investigation of those allegations; misconduct by officers in the Denise H. case; and the credibility of Detective Mustard, including his alleged use of racial epithets.

The prosecutor opposed the motion on the following grounds. First, there was no discoverable evidence concerning the badge bending or other misconduct allegations because these were only allegations in the media.

Second, the defense could not cite to any reliable evidence supporting the badge bending allegations or evidence that such allegations concerned the officers in defendant's case, or any reliable evidence in those allegations. Nor did the defense identify any reliable evidence supporting the racial slur allegation, or the supposition that the police involved in defendant's case were among those who allegedly committed misconduct in the Denise H. case. Additionally, the prosecutor emphasized that the strength of the evidence in the instant case rested in the credible testimony of the victims, rather than law enforcement. She also noted that Detective Mustard was assigned only to S.S.'s case, not P.B.'s case, and that patrol officers had collected the condom and underwear from the alley in the S.S. case.

The trial court denied the motion. In finding the requested discovery was neither relevant nor material, the court observed the police involvement in this case was minimal and the evidence of guilt overwhelming. The court further noted that Detective Mustard's credibility was not particularly relevant in terms of what was at issue in the case.

### 2. Analysis

"Discovery in criminal cases is governed by section 1054." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1093; § 1054, subd. (e).) Section 1054.1, subdivision (e), requires disclosure of "exculpatory evidence" to the defense "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." This statute "requires the prosecution to disclose '[a]ny exculpatory evidence,' not just material exculpatory evidence."[9] (*Barnett v. Superior Court* (2010) 50

---

[9] For purposes of establishing a *Brady* violation, evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Strickler v. Greene* (1999) 527 U.S. 263, 280.)

Cal.4th 890, 901.) A defendant can discover evidence under section 1054.1 without showing the same materiality for establishing a *Brady* violation. (*Ibid*.) We review a court's ruling on a discovery motion for abuse of discretion. (*Prince*, *supra*, 40 Cal.4th at p. 1232.)

Here, the People point out that section 1054.1—the statutory provision governing information to be disclosed by the prosecution—authorizes only pretrial discovery. (§§ 1054, subd. (a), 1054.7; *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 570.) The People also point out that while there is a mechanism for postconviction discovery in section 1054.9, it can only be utilized when a defendant is sentenced to 15 years or more in prison (§ 1054.9), and, in this case, defendant had not been sentenced at the time he made his motion to compel, so the trial court could not consider discovery under section 1054.9. However, the California Supreme Court has made clear that the obligation to disclose favorable and material evidence under *Brady* continues after trial (*In re Lawley* (2008) 42 Cal.4th 1231, 1246), so the trial court properly did not rest on the timing of defendant's motion.[10]

Setting aside the timing of defendant's motion, defendant fails to establish prejudicial error under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Deleoz* (2022) 80 Cal.App.5th 642, 658; see *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1258 [noting the federal Constitution does not confer a general right to criminal discovery].) That is, we see no abuse of discretion in the trial court's determination that the requested discovery was not

---

[10] During oral argument, the People agreed that until sentencing occurs, a prosecutor must comply with the disclosure requirements in *Brady*. But citing *District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. 52, the People claim that a prosecutor's *Brady* disclosure obligations do not continue after judgment. This is a contention that should be made to the California Supreme Court in the appropriate case. Again, here, defendant filed his motion to compel prior to sentencing.

particularly relevant or material to the issues in the case.  But even assuming—generously—that the court committed state law error in denying the requested discovery, the evidence of guilt was overwhelming, and the strength of that evidence rested mainly in the testimony of the victims.  (See *ante*, at p. 3.)  This is not a case where the evidence of guilt turned in major part on the credibility of the police officers involved.  The discovery that defendant sought after his conviction—assuming it existed at all—would have been for impeachment on collateral issues that would not have materially affected the evidence of guilt in this case.

We reject defendant's claim concerning the denial of his post-trial motion to compel.

## G.  Assembly Bill No. 518 and Senate Bill No. 567

Finally, defendant argues the matter should be remanded for resentencing pursuant to Assembly Bill No. 518 (Assembly Bill 518) and Senate Bill No. 567 (Senate Bill 567).  We address these claims in turn.

### 1. *Assembly Bill 518*

Section 654 prohibits multiple punishment for a single act or omission. (*People v. Delgado* (2017) 2 Cal.5th 544, 570.)  Former section 654, subdivision (a), provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Effective January 1, 2022, Assembly Bill 518 amended section 654, subdivision (a), to provide trial courts with the discretion to select which provision a defendant will be punished under.  The statute now reads, in part:  "An act or omission that is punishable in different ways by different

provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

There is no dispute, and we agree, that Assembly Bill 518 is retroactive under *In re Estrada* (1965) 63 Cal.2d 740, and that it applies to nonfinal judgments. (*People v. Jones* (2022) 79 Cal.App.5th 37, 45 (*Jones*).) But we disagree with defendant that he is eligible to benefit from the amended law.

Defendant claims that by staying the sentences on counts 1 and 7 under section 654, the trial court implicitly found those kidnapping offenses arose out of the same course of conduct as the sex offense counts, for which it imposed longer indeterminate sentences. Thus, he argues, he is entitled to resentencing so the court can exercise its new discretion and consider staying one of the sex offense sentences rather than the kidnapping sentences.

Defendant's claim fails. The trial court imposed One Strike sentences for the sex offenses in this case. The One Strike law provides: "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." (§ 667.61, subd. (h).)

In *People v. Caparaz* (2022) 80 Cal.App.5th 669, Division Two of this court held that a trial court is prohibited under section 667.61, subdivision (h), "from suspending or staying the imposition of a One Strike law sentence notwithstanding any other law, including section 654." (*Caparaz*, at p. 689, review denied Sept. 28, 2022, S275894.) We agree with this holding and reject defendant's contention that *Caparaz* was wrongly decided because legislative exceptions to section 654 must be express. The phrase "[n]otwithstanding any other law" in section 667.61, subdivision (h), is typically understood as signaling the Legislature's intent for the statute to prevail over all contrary law, including section 654. (*Caparaz*, at p. 689,

37

quoting *In re Greg F.* (2012) 55 Cal.4th 393, 406 [" 'When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like "notwithstanding any other law" or "notwithstanding other provisions of law" ' "].)

Because the trial court is prohibited from staying the One Strike sex offense sentences, lifting the stays on the kidnapping counts to seek that result would be contrary to law and futile.

### 2. *Senate Bill 567*

Senate Bill 567 amended section 1170, subdivision (b) (1170(b)), to require that when a statute specifies three potential terms of imprisonment, a court must presumptively impose the middle term. (§ 1170(b)(1), as amended by Stats. 2021, ch. 731, § 1.3.) Moreover, a court may not impose the upper term unless aggravating circumstances "justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170(b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) Under section 1170(b)(3), however, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." Senate Bill 567 also amended section 1170(b) to require imposition of the lower term when one of several enumerated contributing factors to the commitment offense exists, such as the defendant "experienced psychological, physical, or childhood trauma," "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170(b)(6).)

Defendant identifies his conviction for criminal threats (count 6) as the sole count to which Senate Bill 567 might apply. On that count, the trial court sentenced defendant to the upper term of three years, doubled to six years under the Three Strikes Law.

Again, there is no disagreement, and we agree, that the amendments apply retroactively. (*Jones*, *supra*, 79 Cal.App.5th at p. 45.) Instead, the focus of the parties' dispute is whether defendant is entitled to remand for resentencing to try to reap the benefits of the new law. In defendant's view, because the trial court did not identify the aggravating factors it relied on to impose the upper term, he is entitled to try to establish that circumstances warrant a lesser term pursuant to amended section 1170(b). Conversely, the People argue that remand for resentencing is unnecessary because the sentence is lawful under the revised statute, and there is no doubt the court would impose it again if resentencing occurred.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

In this case, the record fails to show what aggravating factors the trial court relied on, whether the jury found such factors true beyond a reasonable doubt, and whether the aggravating factors that the court could consider

under the amended statute would cause the court to re-impose the upper term.  Though the trial court remarked at sentencing that defendant "literally forfeited his ability to live in a free society for the rest of his life," the court did not express an intention to impose the maximum possible sentence, and indeed, it exercised its discretion to stay the five-year prior serious felony conviction enhancement.  (Stats. 2018, ch. 1013, §§ 1–2.)  Thus, the court's statement does not reflect a clear and fixed intent to impose the upper term on count 6, irrespective of shifting legislative directives concerning the proper term.

We recognize the practical effect of a resentencing on count 6 is largely academic because of the multiple indeterminate sentences the court imposed here.  Nevertheless, defendant seeks and is eligible for resentencing on this record.  Accordingly, we will remand the matter for further consideration of the recent amendments to section 1170(b).

## H.  Abstract of Judgment

The People point out, and we have found, some errors in the abstract of judgment that require correction.  We enumerate them here for the benefit of the trial court on remand.

First, with regard to count "6A," the abstract indicates that the court imposed a three-year rather than a six-year term, and it fails to reflect that the court stayed the firearm enhancement on count 6, as orally pronounced.

Second, with regard to count "1A and 7A," the reporters transcript indicates the court orally imposed then stayed indeterminate terms for those counts, yet these counts are listed in the abstract for determinate rather than indeterminate terms.  The People also correctly point out that the punishment for counts 1 and 7 was life with the possibility of parole (§ 209, subd. (b)(1)), and the court correctly orally imposed that sentence for count 1,

40

but apparently misspoke when it imposed a sentence of life *without* the possibility of parole for count 7. The court should ensure the correct sentence for both counts appears on the amended abstract.

Third, as to counts 2, 8, and 10, the terms are not designated as consecutive on the abstract, but should be.

Fourth, as to counts 8, 9 and 10, the court imposed terms of 50 years to life, not 25 years to life as indicated on the abstract.

Last, the court orally imposed then stayed firearm enhancements as to various counts except counts 2 and 8, but the abstract reflects the court instead stayed the firearm enhancement as to all counts except counts "6A" and "8A."

## DISPOSITION

The matter is remanded for resentencing in light of section 1170(b), as amended by Senate Bill 567. Whether or not the trial court orders a change in the sentence for count 6, the court should correct the abstract of judgment as discussed herein and the clerk of the court should send the amended abstract to the Department of Corrections. In all other respects, the judgment is affirmed.


FUJISAKI, J.


WE CONCUR:


TUCHER, P.J.


RODRÍGUEZ, J.


*People v. Weathersby* (A163331)

41